Arlen Joe PRICE, Appellant
(Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 89–135.

Supreme Court of Wyoming.

March 12, 1991.

Leonard Munker, State Public Defender, Gerald M. Gallivan, Director of the Wyoming Defender Aid Program, Robert T. Butler and Douglas J. Gardner, Student Interns for Wyoming Defender Aid Program, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., and Kaylin D. Kluge, Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

## OPINION

MACY, Justice.

Appellant Arlen Joe Price appeals from his conviction for first-degree murder.

We affirm.

Appellant presents the following issues for our review:

I. Because the jury instructions and the form of the verdict gave the jury the choice between two theories of the first degree murder—premeditated or felony murder—and it is impossible to determine upon which theory the jury based its verdict, and because the court determined at the end of the defense's case that there was insufficient evidence of aggravated robbery as a matter of law, Appellant is entitled to a new trial.

II. Because as a matter of law there was insufficient evidence of intent to commit larceny, the Appellant is entitled to a reversal and a remand for the purposes of retrial on the premeditated theory, without the possibility of felony murder.

III. The trial court erred when it conditioned the admiss[i]bility of the testimony of defendant's expert upon the laying of a proper foundation i.e. when the court required the testimony of the defendant before permitting testimony of the expert.

IV. Expert testimony from Dr. Brian Miracle should have been allowed as to (a) whether he thought the Appellant did the actual stabbing of the victim and (b) why the defendant would come into court and say that he had committed the murder he had been accused of, when he had not.

During the evening of February 25, 1989, Appellant and a man referred to as "Chief" went to the home of Appellant's uncle, Lewis "Sonny" Price, Jr., near Jackson, Wyoming. Appellant was carrying a handgun, and Chief was carrying a knife. After Sonny invited Appellant and Chief into his trailer, Appellant brandished the gun and told Sonny that he was going to "make him pay." Sonny and Appellant began to wrestle, and the gun discharged a bullet which did not hit anyone. Chief went to Appellant's aid, jumped on Sonny, and stabbed him in the side. Appellant got up off the floor, checked to see if anyone in the neighborhood was aware of what was taking place, grabbed the knife, and stabbed Sonny to death.

The two men left the trailer and went to Appellant's mother's house to change out of their bloody clothes. Appellant told his mother that he killed Sonny, and then he and Chief departed for Salt Lake City, Utah. After they spent time in Salt Lake City trying to borrow money, Appellant and Chief went to Nevada. They eventually arrived in Las Vegas and began to gamble. On March 4, 1989, Chief took Appellant's car without Appellant's knowledge and drove to Lake Mead National Recreation Area where park rangers shot and killed him when he threatened them with a

gun. The police apprehended and arrested Appellant in a casino after they received a telephone call from an individual whom Appellant told about the killing.

After he was taken into custody, Appellant told police officers that he went to Sonny's place to kill him, but he stated that he did not attempt to rob Sonny. He said that he killed Sonny to pay him back for the pain he had caused Appellant's family, especially his younger brother, Timmy. Appellant and Timmy claimed that Sonny had raped them, and Timmy claimed that Sonny forced him to perform bestialities.

Appellant was charged with first-degree murder in violation of Wyo.Stat. § 6–2–101 (1988), *amended by* 1989 Wyo.Sess.Laws ch. 171, § 1 (effective March 6, 1989),[1] and aggravated robbery in violation of Wyo. Stat. § 6–2–401 (1988).[2] On May 9, 1989, a jury found Appellant guilty of first-degree murder, and the trial court subsequently sentenced him to serve a life term in the Wyoming State Penitentiary.

Although Appellant raises four issues for our consideration, we consolidate them into the following two questions which encompass Appellant's arguments: (1) Is Appellant's conviction for first-degree murder supported by sufficient evidence of felony murder; and (2) did the trial court err by limiting the scope of testimony given by a psychologist who testified on behalf of Appellant?

### Sufficiency of the Evidence

■ Appellant's first two issues challenge the sufficiency of the evidence which supports Appellant's first-degree murder conviction. At the trial, the State sought Appellant's conviction for first-degree murder on the basis of premeditation or, alternatively, for felony murder with robbery as the underlying felony and for aggravated robbery. Appellant moved for a judgment of acquittal on both charges pursuant to W.R.Cr.P. 30. The trial court refused to send the issue of aggravated robbery to the jury but determined that the jury should decide whether Appellant committed or attempted to commit robbery. The jury found Appellant guilty of first-degree murder, but the verdict form did not state whether the basis for the conviction was premeditation or felony murder with robbery as the underlying felony.[3] Appellant now asserts that the record does not contain sufficient evidence to support a conviction for robbery or attempted robbery and that:

When a count is brought on two separate theories, and there is insufficient evidence on one of the theories, if it is impossible to determine upon which theory the conviction rests, the verdict is to be set aside, and a new trial granted. *Yates v. U.S.*, 354 U.S. 298, 77, S.Ct. 1064, 1 L.Ed.2d 1356 (U.S.Cal. June 17, 1957); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (U.S.Cal., May 18, 1931); *Cloman v. State*, 574 P.2d 410 (Wyo., 1978).

■ This Court previously dealt with a similar fact situation in *Cloman v. State*, 574 P.2d 410 (Wyo.1978). In that case, the appellant was convicted of first-degree murder, but the ambiguous verdict form and jury instructions produced the following question: "Did the jury find evidence of premeditated murder or felony-murder in the commission of a robbery, or both?"

1. At the time of the murder, § 6–2–101 provided:

   (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest or kidnapping, or by administering poison or causing the same to be done, kills any human being is guilty of murder in the first degree.
   (b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law.

2. Section 6–2–401(c) provides:

   (c) Aggravated robbery is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years if in the course of committing the crime of robbery the person:
   (i) Intentionally inflicts or attempts to inflict serious bodily injury; or
   (ii) Uses or exhibits a deadly weapon or a simulated deadly weapon.

3. The verdict form stated in part: "We, the jury, find the defendant, X̲ Guilty ___ Not Guilty of murder in the first degree."

*Id.* at 412. We upheld the conviction for first-degree murder because the evidence "justified the holding that the jury found both premeditated murder and felony-murder in the commission of a robbery." *Id.* *See United States v. Natelli,* 527 F.2d 311 (2d Cir.1975), *cert. denied* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976).[4] If each alternative ground for a defendant's first-degree murder conviction is supported by substantial evidence, we will not set aside the conviction solely because we are unable to determine which ground served as the basis for the jury's decision.

▆▆▆ Appellant does not dispute the sufficiency of the evidence demonstrating that he committed a premeditated murder, so we must determine if the record reveals sufficient evidence which indicates that he killed Sonny in the perpetration of a robbery or an attempted robbery. Section 6–2–401(a) provides:

(a) A person is guilty of robbery if in the course of committing a crime defined by W.S. 6–3–402 he:

(i) Inflicts bodily injury upon another; or

(ii) Threatens another with or intentionally puts him in fear of immediate bodily injury.

Wyo.Stat. § 6–3–402(a) (1988) is a subsection of our larceny statute, and it states: "A person who steals, takes and carries, leads or drives away property of another with intent to deprive the owner or lawful possessor is guilty of larceny." Wyoming's attempt statute provides in pertinent part:

(a) A person is guilty of an attempt to commit a crime if:

(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A "substantial step" is con-

duct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime * * *[.]

Wyo.Stat. § 6–1–301(a)(i) (1988). To ascertain if sufficient evidence of robbery or attempted robbery exists,

[w]e examine all the evidence in the light most favorable to the State * * *.

"[I]t is not whether the evidence establishes guilt beyond a reasonable doubt for us, but rather whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in the light most favorable to the State.

\*     \*     \*     \*     \*     \*

"It is not our function to weigh the evidence for a determination as to whether or not it is sufficient to establish guilt beyond a reasonable doubt. We have consistently held that even though it is possible to draw other inferences from the evidence presented, it is the responsibility of the jury to resolve conflicts in the evidence."

*Mendicoa v. State,* 771 P.2d 1240, 1243 (Wyo.1989) (quoting *Broom v. State,* 695 P.2d 640, 642 (Wyo.1985) (citations omitted)).[5]

At the trial, Appellant's mother testified about the conversation she had with Appellant on the night of the killing. According to her, Appellant told her that he pulled out his gun and that

he asked for Sonny to open the safe to give him some money, and Sonny told him he couldn't open the safe for him. And then he got down on his knees and grabbed ahold of Arlen and told him, begged him not to do this to him. Told him to just go away; that he would for-

---

4. We quoted the rule from *Yates v. United States,* 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957), which states that the "'proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.'" *Cloman,* 574 P.2d at 412.

5. Appellant's second issue challenges the district court's decision to deny his motion for acquittal under W.R.Cr.P. 30. When reviewing a district court's decision to deny a motion for acquittal, we apply the standard quoted in *Mendicoa* and determine whether sufficient evidence exists to sustain the charges. *Chavez v. State,* 601 P.2d 166 (Wyo.1979); *Cloman,* 574 P.2d 410.

get about it. And then they got to wrestling and the gun went off, but he said he didn't know if he hit Sonny or not. That testimony, in addition to Appellant's statements that he stabbed Sonny at least four times and the fact that Sonny died from knife wounds, viewed in the light most favorable to the State, is sufficient evidence to uphold Appellant's conviction for killing a human being during the attempted perpetration of a robbery (felony murder) under § 6–2–101.

### The Admissibility of Psychological Testimony

■ Appellant's final two issues challenge the district court's evidentiary rulings which restricted the testimony of a psychologist who testified on Appellant's behalf. At the trial, Appellant claimed that he lacked the mental capacity to form the requisite specific intent necessary to maintain a first-degree murder conviction. To prove his contention, Appellant informed the district court that he intended to call a psychologist who would testify about Appellant's mental condition. The court stated that Appellant would have to lay a foundation for the psychologist's testimony by testifying himself because Appellant consulted the psychologist only for purposes of litigation, because Appellant had not pleaded not guilty by reason of insanity, and because the psychologist was not a witness to the crime. After the court informed Appellant of his right not to testify, Appellant took the stand and admitted killing Sonny.

Appellant contends that the district court forced him to give up his right not to testify by exclusively requiring his testimony as a foundation for the psychologist's testimony. We have stated many times that making the decision to allow an expert to testify is within the sound discretion of the trial court. *Braley v. State*, 741 P.2d 1061 (Wyo.1987); *Buhrle v. State*, 627 P.2d 1374 (Wyo.1981). The district court erred, however, when, before the psychologist took the stand, it determined that Appellant's testimony was necessary to establish an adequate foundation for the psychologist's testimony. Regardless of whether the district court based its directive on the relevancy requirement of W.R.E. 402,[6] the standards for expert testimony specified in W.R.E. 702 and 703,[7] or the hearsay rule, W.R.E. 802,[8] a trial judge may not rule prospectively on a party's ability to establish a proper foundation for expert testimony.

■ We hold that the district court's error was harmless, however, because it did not prejudice Appellant's substantial rights. An error warrants reversal if it is prejudicial and if it affects an appellant's substantial rights. Otherwise, the error is harmless. *Loomer v. State*, 768 P.2d 1042 (Wyo.1989). The district court's establishment of a foundation prerequisite was a harmless error for two reasons. First, because Appellant's theory of defense was that his mental condition prevented him from forming the requisite specific intent for premeditated murder and not that he did not kill Sonny, his in-court admission that he killed Sonny did not incriminate him more than he had already been incriminated.

6. W.R.E. 402 states:
   All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible.

7. W.R.E. 702 provides:
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

W.R.E. 703 states:
   The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

8. W.R.E. 802 provides:
   Hearsay is not admissible except as provided by these rules or by other rules adopted by the Supreme Court of Wyoming or by statute.

Second, the district court did not force Appellant to testify about anything other than the information the district court required as a foundation for the psychologist's testimony. Appellant could have limited the scope of the State's cross-examination. Once Appellant began testifying about Sonny's death, he opened the door for the State's inquiry into that matter. W.R.E. 611(b) provides:

(b) *Scope of cross-examination.*— Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.[9]

Several federal courts have determined that, when a defendant takes the witness stand, the prosecution's cross-examination is limited to matters *reasonably related* to the subject matter of direct examination. *Aldridge v. Marshall*, 765 F.2d 63 (6th Cir.1985), *cert. denied* 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986); *United States v. Hernandez*, 646 F.2d 970 (5th Cir.), *cert. denied* 454 U.S. 1082, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981); *United States v. Panza*, 612 F.2d 432 (9th Cir.), *cert. denied* 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 *and* 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1118 (1980). As a result, a defendant may testify in an effort to lay the foundation for the testimony of another witness without opening the door for the State to ask questions on cross-examination about the crime which the defendant is accused of committing. "The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry." *Brown v. United States*, 356 U.S. 148, 155, 78 S.Ct. 622, 627, 2 L.Ed.2d 589, 72 A.L.R.2d 818 (1958). *See also McGautha v. California*, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971); *and Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

Appellant also contends that the district court erred when it prevented the psychologist from testifying about whether Appellant actually killed Sonny and about Appellant's motivation for claiming that he killed Sonny. At the trial, the following colloquy occurred between Appellant's attorney and the psychologist:

Q. Do you have an opinion as to whether or not Arlen Price was able to control his behavior in so far as it related to Sonny Price?

A. Control his behavior. I think that he was so obsessed and that he was compelled to do what he did, and I think that had he not done it some two or three—

MR. ROGERS: Objection. He's going beyond the scope of the question.

THE COURT: True. Sustained.

Q. Did you talk to him yesterday about whether suppose, for instance, Sonny Price was in this courtroom today and with the police all around what would he have to do? Did you talk to him about that?

A. Yes.

Q. And what did he tell you?

A. That he would kill him right here.

Q. And is that—what does that have to do with your diagnosis here?

A. It's a continuation of this obsession. Total obsession takes up a lot of his daily time, and state of mind of what has been inflicted upon him now. He wants to handle it.

Q. Now, you've spent a lot of time in this case examining the evidence, haven't you?

A. Yes.

Q. And I guess you've already testified that you've spent a great deal of time talking to the witnesses including Arlen Price; isn't that right?

A. Yes.

Q. Is there any doubt in your mind as to whether or not Arlen killed Sonny Price?

A. None whatsoever, as far as his being there. I have talked with him at great length. I have some real reservations whether or not he actually did the crime.

9. W.R.E. 611(b) is identical to Fed.R.Evid. 611(b).

Q. Why is that?

A. Because—

MR. ROGERS: Objection, Your Honor. Invades the province of the jury.

THE COURT: Sustained.

In the discussion which followed, the district court reiterated the rule that a diminished capacity defense does not exist in Wyoming. The court stated that the psychologist could not "testify about the mental state or condition constituting an element of the crime or a defense; that the ultimate issue in that instance is left for the trier of fact." The court also expressed concern about allowing the psychologist to testify that Appellant did not kill Sonny and that Appellant had a motive for lying about the matter because such testimony would be contrary to Appellant's testimony.

We first note that the district court was correct when it stated that Wyoming has not recognized a diminished capacity defense.[10] In *Dean v. State*, 668 P.2d 639, 645 (Wyo.1983), this Court affirmed the district court's decision to reject diminished capacity and irresistible impulse instructions because

the legislature has set forth the standard [in Wyo.Stat. §§ 7–11–301 to –304 (1987) [11] relative to the mental condition which will constitute a defense to a criminal charge. Such standard should not be increased or decreased. .

That rule applies with equal force to Appellant's claim that his mental condition (obsessive/compulsive) prevented him from forming the requisite specific intent necessary to sustain a first-degree murder conviction.

▮ Appellant contends that the district court erred by preventing the psychologist from testifying as to whether he thought Appellant actually killed Sonny because that testimony embraced the ultimate issue. We have rejected the rule that an expert cannot testify on the ultimate issue in a case. *Reed v. Hunter*, 663 P.2d 513 (Wyo.1983). W.R.E. 704 states: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." W.R.E. 702 mandates that the testimony "assist the trier of fact." [12]

We hold, however, that the district court did not abuse its discretion when it prevent-

---

**10.** We have recognized a limited exception for the defense of automatism. *Fulcher v. State*, 633 P.2d 142 (Wyo.1981). *See also Polston v. State*, 685 P.2d 1 (Wyo.1984).

**11.** Section 7–11–301(a)(iii) provides:

(a) As used in this act:

\* \* \* \* \* \*

(iii) "Mental deficiency" means a defect attributable to mental retardation, brain damage and learning disabilities[.]

Section 7–11–302 provides:

(a) No person shall be tried, sentenced or punished for the commission of an offense while, as a result of mental illness or deficiency, he lacks the capacity, to:

(i) Comprehend his position;

(ii) Understand the nature and object of the proceedings against him;

(iii) Conduct his defense in a rational manner; and

(iv) Cooperate with his counsel to the end that any available defense may be interposed.

Section 7–11–304 provides in pertinent part:

(a) A person is not responsible for criminal conduct if at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked substantial capacity either to appreci-

ate the wrongfulness of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms mental illness or deficiency mean only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable primarily to self-induced intoxication as defined by W.S. 6–1–202(b).

(b) As used in this section, the terms "mental illness or deficiency" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) Evidence that a person is not responsible for criminal conduct by reason of mental illness or deficiency is not admissible at the trial of the defendant unless a plea of "not guilty by reason of mental illness or deficiency" is made. A plea of "not guilty by reason of mental illness or deficiency" may be pleaded orally or in writing by the defendant or his counsel at the time of his arraignment. The court, for good cause shown, may also allow that plea to be entered at a later time. Such a plea does not deprive the defendant of other defenses.

**12.** *See supra* note 7.

ed the psychologist from testifying about whether Appellant killed Sonny. Not only would the testimony have failed to assist the jury with its decision, but that testimony would have challenged the veracity of Appellant's testimony.

The psychologist attempted to say that the evidence he reviewed led him to doubt that Appellant actually killed Sonny, despite Appellant's testimony to the contrary. The combination of his understanding of the facts of the crime with his medical opinion that Appellant would be compelled to take credit for the killing led the psychologist to doubt the veracity of Appellant's testimony. In *Smith v. State*, 564 P.2d 1194, 1200 (Wyo.1977), we held that an expert may not testify about the veracity of a defendant's version because "it assumes the function of the jury." *See also Lessard v. State*, 719 P.2d 227 (Wyo.1986). In addition, the psychologist's testimony indicating he doubted that Appellant killed Sonny did not assist the jury. While the psychologist may have been an expert for the purposes of determining an individual's mental condition, he was in no better position than the jury to decide whether Appellant actually stabbed Sonny to death.

Affirmed.

CARDINE, J., files a specially concurring opinion.

URBIGKIT, C.J., files a dissenting opinion.

CARDINE, Justice, specially concurring.

While I agree that this case should be affirmed, I take issue with the court's treatment of the issue raised concerning Price's testifying. The majority finds harmless error in the giving of the testimony. If Price's testifying resulted in error, it was anything but harmless, for he described in vivid detail the crime for which he was convicted. I find no error, however, because Price waived his privilege against self-incrimination by voluntarily taking the stand. If the court's ruling that Price's expert could not testify unless Price testified was erroneous, that error was pre-

served whether Price testified or not. Thus, Price was not forced to testify to preserve the error; nor may he decide to testify and create additional error. By waiving his right to remain silent at trial, I fail to see how he can claim error before this court.

Before Price took the stand, outside of the presence of the jury, the court addressed him as follows:

"THE COURT: * * * Mr. Price, do you understand that you do not have to testify?

"MR. PRICE: Yes, sir.

"THE COURT: And do you understand that that right is a right that only you can waive? Let me put it a different way so there's no misunderstanding. Mr. Price, you are the only one who ultimately finally makes a decision as to whether or not you testify. * * * Do you understand that?

"MR. PRICE: Yes, sir."

The court then asked Price if he had any questions. Price responded he did not know if he had any questions. The court suggested that Price should discuss the matter with his attorney. Price's attorney then questioned Price to demonstrate that he was agreeing to testify on the attorney's advice in order to allow the psychologist to testify. Price affirmed that he alone had made the choice to testify.

A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and the waiver is no less effective or complete because the defendant may have been motivated to take the stand only by reason of the strength of lawful evidence against him. *Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968). In *Harrison*, the defendant testified to rebut illegally obtained and erroneously admitted evidence against him. 392 U.S. at 224, 88 S.Ct. at 2011. Price makes no claim that his testimony was prompted by any tainted evidence. Rather, Price chose to testify as part of a defense strategy in an attempt to counter the State's evidence. *Cf. United States v. Hearst*, 563 F.2d 1331 (9th Cir.

1977), *reh. denied* 573 F.2d 579 (9th Cir. 1978), cert. denied 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). The only claim Price makes as to the State's evidence is that it was insufficient to convict him of felony murder. He does not argue about the propriety of the State's evidence.

"That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought of an invasion of the privilege against compelled self-incrimination." *Williams v. Florida*, 399 U.S. 78, 84, 90 S.Ct. 1893, 1897, 26 L.Ed.2d 446 (1970).

Price waived his privilege when he chose to take the witness stand.

I cannot accept the court's harmless error analysis for another reason. The court states the "error" was harmless because it did not prejudice Price's substantial rights. Maj. op. at 913. However, the alleged error concerns his constitutional right against self-incrimination. United States Constitution, Amendments 5 and 14; Wyoming Constitution, Art. 1, § 11. Before a constitutional error can be held harmless, it must be found to be harmless beyond a reasonable doubt. *Campbell v. State*, 589 P.2d 358, 367 (Wyo.1979); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065 (1967). Price's direct testimony involved the intimate details of the killing for which he was convicted. Regardless of the other evidence in this case, I have much more than a reasonable doubt, indeed serious doubt, that such testimony was harmless.

Due to these concerns, I join the court in the result only on this issue and concur on the other issues raised.

URBIGKIT, Chief Justice, dissenting.

This record paints a picture of evil—persons and events—and if not for the harm to be continued by precedent for future cases, I would leave unopened the volumes of testimony and simply dissent. Unfortunately, the guilt of appellant Arlen Joe Price in the brutal murder of his homosexually, incestuously child raping uncle, Lewis "Sonny" Price, Jr., cannot be sorted out from the processes of his trial or the decision now written by the majority of this court. Evil frequently lives on after its carrier has departed existence. That evil infected Brent E. Miller (Chief) who participated in the homicide, or more likely committed it himself, and then apparently chose to end it all by walking into the shotgun blast of the park ranger at Lake Mead in southern Nevada.

## I. INTRODUCTION TO THIS TRAGEDY

Students of current law, in considering precedent to be the cornerstone, recognize and discuss in detail today that precedent from an individual case cannot be extracted from the particular facts from which the decision was made. Comparably, this case should not be perpetrated upon future litigation without recognition of all encompassing tragedy, detail and horror from which this appellant's conviction and life sentence resulted. Students of Greek tragedies and devotees of horror movies could find no more unbelievable the misuse of humanity than what comes to front stage here to showcase the death of Sonny Price and Chief, the penitentiary confinement of appellant's brother Timmy, and now the life sentence of appellant for murder. Timmy, in years gone by, had been repeatedly raped by his uncle, Sonny Price, without criminal prosecution and the same perversion was committed upon appellant. Within these facts and other family conflicts, this case did not just happen one cold winter night in a trailer house near Jackson, Wyoming. It took a lifetime of horrible acts to get here. The issues created in the admitted homicide prosecution followed from action by appellant against his uncle from an attitude which had been advertised in a number of public statements and became well known by the ultimate victim.

The distasteful and disgusting history of the sexual abuse committed by appellant's uncle and the consuming hatred held for him by appellant colors and pervades this record. No one with knowledge of this family doubted that the hatred existed and, overtly, the uncle knew and feared when

and how the price might be collected by appellant's stated intent to kill him. This record tells an unbelievably nasty, brutal and perverted tale of cardinal sins and the ultimately effected capital punishment for those offenses committed upon two small boys by homosexual rape and bestiality.

Dead now is the uncle's participating boyfriend, which occurred in earlier time, the uncle who was killed and Chief who walked into the gun in Nevada with the apparent intent to die. Surviving only in terms hardly less tragic is appellant with his life sentence and his younger brother who, at trial date, was serving an extended term in the Wyoming State Penitentiary for rape. I fear that the evil which consumed the relationship of these parties in early life, followed by homicide and ultimate trial, will now emanate from Wyoming case law to spread its pervasive pollution in future cases.

This record would sustain criminal case determination that Chief and appellant went to the rural trailer house where Sonny Price resided with criminal intent—appellant to kill and Chief to obtain money or property by robbery. The record lacks in substance, however, that appellant intended to or did individually commit either larceny or robbery and, furthermore, leaves in doubt who wielded the knife by which the victim was stabbed a number of times.

## II. ISSUES PRESENTED BY THIS APPEAL

Without question, appellant was involved in the "transaction" from which the death intentionally resulted to a degree that the resulting life sentence is not necessarily a shock to any judicial conscience.

It is, however, what occurred at trial, which by majority opinion may cause future damage to Wyoming law, that causes my present significant concern. Those seeds now planted for future noxious growth include in adjudicatory terms:

1. Prosecution was pursued on both a felony murder and premeditated murder basis, but the verdict form neither permitted nor required the jury to determine which of either was proved since the decisive crime of convicted guilt could not be identified by the jury on the submitted verdict form.

2. Submission of the case on a first degree felony murder charge based on robbery was improper after the trial court determined there was insufficient evidence to submit robbery as a separate criminal charge.

3. Requiring appellant to testify and admit to the offense in violation of his right against self-incrimination as a court ordered predicate to establish a foundation to allow the psychologist to testify "as a matter of foundation" cannot possibly be considered in this case to be harmless error under *Chapman v. State of California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh'g denied* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967). This majority ignores the *Chapman* test for harmless constitutional error which requires proof by the prosecution to show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

## III. DISJUNCTIVE CRIMES CHARGED AND UNDIFFERENTIATED VERDICT FORM SUBMITTED

This case authenticates how harmless error by direction or implication as an absolution of error in initial opinion will then, by created precedent, promote carelessness or intentional disregard in future cases. The subject of a proper verdict form for alternative charges of premeditated or intentional (malice) murder and felony murder has a chaotic history. This subject first received direct consideration in Wyoming by this court in *Cloman v. State,* 574 P.2d 410 (Wyo.1978).[1]

---

1. There are literally thousands, if not tens of thousands, of felony murder cases since the crime exists in a majority of the jurisdictions as the equivalent of intended or premeditated murder for assessment of the first degree murder

crime with variations predominating. Among the perhaps 40,000 violent caused deaths arising annually in this country, a significant percentage go to trial on a felony murder basis since most murders do not occur in the abstract, but

In *Cloman*, 574 P.2d at 412, this court assessed the verdict form to recite the crimes in the disjunctive, "[d]id the jury find evidence of premeditated murder or felony-murder in the commission of a robbery, or both?" The court then recognized "[t]he 'proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.'" *Id.* at 412 (quoting *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957)).

To answer the disjunctive dilemma and comply with the proper rule, the court then exercised its fact finding persuasion to conclude:

> In summary, as supplemented by Instruction 12, the disjunctive verdict rendered in this case, to-wit that defendants were guilty of killing * * * purposefully and with premeditated malice *or* in the commission of, or in an attempt to commit, a robbery, causes no ambiguity or uncertainty when the facts, circumstances and legitimate inference substantially support all of the essential elements of both offenses. The district court was not in error in overruling defendants' motions. The remaining assignments of error are found to lack merit sufficient to find reversible error.

*Cloman*, 574 P.2d at 422 (emphasis in original).

There was a major hiatus in the *Cloman* case and its reasoning where the court inspected the entire body of evidence and opined sufficiency to support a finding—as if it had been made—by the jury of conviction on both charges when, in empirical fact, the jury convicted on one, the other, or on both. In that hypothetical resolution, there is absolutely no way to now determine what decision was actually made. Furthermore, there is no way to tell whether the jury thought out the difference since the identical result was reached. In actuality, this appellate court in *Cloman* factual-

ly found that the defendant was guilty of both premeditated and felony murder, but the record lacks capacity to reveal what the fact finding jury itself decided. Some jurors may have found felony murder, some jurors may have found premeditated murder, and since all agreed in the end result, the verdict could have been made without a unanimous decision rendered.

The issue presented in this case on the verdict form addresses the requirement of the jury to render a unanimous verdict on a specifically enumerated offense and make a record which will then authenticate what decision was made. The record demonstrates that neither criteria for equal protection and due process was provided to appellant. This court now hypothetically determines that the jury could have made the unanimous decision and, if they had, it could have been supported by substantial evidence. Recognition of the dichotomy is required which results from the use of a multiplexed theory undesignated verdict form given to the jury for decision which permitted alternative compromise decisions.

By statement filed March 28, 1989, appellant was charged disjunctively as follows:

### COUNT 1

### ELEMENTS

[MURDER IN THE FIRST DEGREE

§ 6–2–101 W.S.1977, as amended]

1. The defendant
2. On or about the 25th day of February, 1989
3. In the County of Teton, State of Wyoming
4. Purposely and with premeditated malice or

   in the perpetration of a robbery or

   in the attempt to perpetrate a robbery
5. did kill a human being.

Responsively, appellant filed a Motion to Elect through his counsel in April 1989:

---

are accompanied by other crimes of some character—frequently robbery, rape or to silence the witness.

COMES NOW the defendant, Arlen Joe Price, by and through his attorney, * * *, and moves the Court for an order requiring the State to elect the theories on which it intends to proceed in this case and as good cause therefore states as follows:

1. Count I of the Information charges the defendant with **MURDER IN THE FIRST DEGREE,** based upon two separate and distinct theories. The first theory is that the defendant did purposely and with premeditated malice kill Lewis Price, Jr. The second theory is that the killing took place during the perpetration of and attempt to perpetrate a robbery.

2. The two theories the State is proceeding on are inconsistent and based upon entirely different motives. It would be patently unfair to permit the State to proceed on both theories. The defendant has an absolute right to be informed of the charges against him so that he can properly defend the case. If the charge is **ROBBERY MURDER,** and the State intends to proceed on the charge, then the defendant needs to be properly informed that this is the State's theory. The same is true if the actual theory is **PREMEDITATED MURDER.**

(Emphasis in original.) That motion and other variant motions, including suppression of confession and limine motions of both litigants, were considered at an oral argument session held shortly thereafter. Disposition was then made by order entered April 26, 1989 in regard to this issue stated "[t]hat with regard to the defendant's Motion to Elect, the defendant is only charged with one offense and it will be up to the jury to decide which elements, if any, were violated."

Instruction No. 6 was then given, quoting the Wyoming Statutes in part:

"(a) Whoever purposely and with premeditated malice, or in the perpetration, or attempt to perpetrate, any * * * robbery * * *, kills any human being is guilty of murder in the first degree."

The necessary elements of the crime of first degree murder are as follows:

1. The defendant, a person
2. On or about the 25th day of February, 1989
3. In the County of Teton, State of Wyoming
4. Purposely and with premeditated malice; or

   in the perpetration of a robbery; or

   in the attempt to perpetrate a robbery
5. Did kill a human being.

If you find from your consideration of all of the evidence that any of these elements ha[ve] not been proved beyond a reasonable doubt, then you should find the defendant not guilty of first degree murder.

If, on the other hand, you find from your consideration of all of the evidence that each of these elements ha[ve] been proved beyond a reasonable doubt, then you should find the defendant guilty of first degree murder.

The verdict form then used was a matter of complete simplicity which accorded with the trial judge's ruling and discussion during the instruction conference:

We, the jury, find the defendant, X Guilty __ Not Guilty of murder in the first degree.

(In the event you find the defendant not guilty of murder in the first degree complete one of the following:)

The obvious problem with the jury verdict form and the disjunctive instruction as given was that the jury could find appellant guilty of first degree murder without a unanimous decision among its members that he was guilty of either premeditated murder, felony murder, or both. Each of the jurors could vote for the result without necessarily agreeing with the others that guilt was proved on both bases for the case submission. Two entirely separable proscribed acts within the course of conduct were combined for an either or both perspective for jury decision. Appellant may have either killed or robbed or, during the course of a robbery, his companion may have killed.

The principal vice of this character of alternative decision submission is that it removes from the jury the unanimous decision making requirement and places guilt determination upon first, the discretion of the prosecutor to charge in the alternative and second, the trial court to instruct so that a specific decision is not required. Intrinsically, this readjusts a fact finding function to this court for determination of what the jury could have done but did not because they were not appropriately instructed, and if they had been appropriately instructed, whether there was sufficient evidence to sustain those alternatively potential but non-made decisions.

In this case, the dichotomy is highlighted when the trial judge determined that insufficient evidence was available to submit a robbery charge against appellant and then submitted a felony murder theory based on the same apparently unproved robbery. The discomfort of appellant with the structure of the case where the evidence against him of robbery was insufficient to justify jury conviction on that charged offense, yet sufficient to justify a felony murder verdict, is certainly to be appreciated.

The problem really results from the haste of the appellate court, as did this court in its per curiam decision of *Cloman,* 574 P.2d at 422, to affirm the conviction and then not take time to tell the trial bench and practicing bar how it should be done so that it is right. Too many appellate decisions are composed as if this court is an intermediate appellate court responsible only for deciding cases and not for creating a structure of the law that provides the stability and specificity for future cases.

Disjunctive instruction and verdict cases of charged premeditated murder and felony murder create a particularly pervasive error since the basis of conviction is partly competitive or contradictory. In first instance, the charged offense claims to be the result of premeditated and/or intended killing where the felony murder is based on a presumed intent derived from another character of conduct where direct intent to kill is not a factor in the offense. This is not to suggest that a dual theory of prosecution is inappropriate where the prosecution contends that evidence of plan and premeditation was present as a character of first degree murder, but that if that element is not proved beyond a reasonable doubt, the second criteria of the offense, mainly felony murder, can supply the missing evidence for murder conviction. Jury instructions and the verdict form should follow the concept of alternative criminal conduct and permit and require the jury to make the finite decision in a given case. That decision could be that the killing was planned and consequently premeditated, but the killing was also in conjunction with a planned felony offense and, consequently, constituted felony murder, or that either or both of the foregoing may not have existed. If both did not exist, then a lesser included offense should be properly presented for consideration. See, for example, Annotation, *Propriety of Lesser–Included–Offense Charge to Jury in Federal Homicide Prosecution,* 101 A.L.R.Fed. 615 (1991) and Annotation, *Lesser–Related State Offense Instructions: Modern Status,* 50 A.L.R.4th 1081 (1986).

In direct reference to the *Cloman* application now made, the question is not whether the evidence "justified the holding," *id.* at 412, but rather whether the jury made a decision that there was guilt of first degree murder either because of the premeditated character, or because it was felony murder, or both. It is not that as a result of the occurrence it must have been either one or the other and, as such guilt exists, without proof that each one or either one was specifically determined. Significant in this case is that evidence of appellant's interest in robbery is less than overwhelming. All of his confessions and statements which were of a consistent trend, as well as all of the supporting evidence, indicate a hatred and willingness to kill, but no indication of a larceny proclivity. Conversely is the convincing evidence that Chief clearly was only involved for monetary purposes. Nothing is shown in this record that Chief went to the scene of the homicide with the intent to commit a homicide.

The statement of the majority sets forth quite clearly the principle now adopted for our future cases: "If each alternative ground for a defendant's first degree murder conviction is supported by substantial evidence, we will not set aside the conviction solely because we are unable to determine which ground served as the basis for the jury's decision." By this adaptation, this majority creates a new rule for insufficiency of evidence to prove guilt beyond a reasonable doubt and to require a unanimous decision of the jury which extrudes from this factual climate of horror and perversion with the apparition of a Hollywood monster. The principle now created for Wyoming law as a result of this analysis directly attacks the unanimous verdict requirement of Wyo.Const. art. 1, § 9. *Taylor v. State*, 612 P.2d 851 (Wyo.1980).

Guidance should be taken from *United States v. Natelli*, 527 F.2d 311, 325 (2nd Cir.1975), *cert. denied* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976):

When there is more than one specification as a predicate for guilt, each dependent on particular evidence which is unrelated to the other, it would be sound practice to instruct the jury that they must be unanimous on a particular specification to convict.

The circuit court went on to reverse the conviction of one appellant and remand it for retrial. Upon rehearing, the panel of the federal appellate court reversed the decision on a basis of improper objection during trial. A second rehearing consideration was then given where the court stated:

> *Yates v. United States*, 354 U.S. 298, 311–312, 77 S.Ct. 1064 [1073], 1 L.Ed.2d 1356 (1957), and *Stromberg v. California*, 283 U.S. 359, 367–68, 51 S.Ct. 532 [535], 75 L.Ed. 1117 (1931), can be read as covering the situation where a jury may have convicted on the very specification which is insufficiently proved to make out an offense.
>
> That is true, especially, when the specifications in the single count relate to two distinct incidents or fact patterns, * * *, rather than being merely a charge of alternate ways of violating a statute stated in the conjunctive.

*Id.* at 328 (footnote and citations omitted). In finite result, the circuit court then found a sufficient objection and reversed on the basis of the undefined alternative basis for jury decision.[2]

The basis for these offenses is more thoughtfully provided by *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555, 560–61 (1989):

> Premeditation and deliberation is a theory by which one may be convicted of first degree murder; felony murder is another such theory. Criminal defendants are not convicted or acquitted of theories; they are convicted or acquitted of crimes.

As that case would reflect, it is my premise that the prosecution is required to elect either or both theories and the jury then to determine separately which of either theo-

---

**2.** The disjunctive undefined jury decision directly conflicts with the thesis found in one of the few current academic reviews supporting retention of felony murder. The certainty and specificity premise is lost if a separate jury decision is not required to apply a preclusive pathway to achieve first degree murder.

If properly defined and applied, the felony murder doctrine sometimes provides the advantage of greater clarity. The mental state of intention to commit robbery, rape, or kidnapping is less ambiguous than the terms generally governing homicidal mental states. Particularly when the offense is spontaneous, occupies only a brief time span, and is dependent upon mental impulses evidenced only the defendant's actions, such terms premeditation, deliberation, malice, or even "intent" leave jurors with a difficult judgment. Such ambiguity is undesirable because it pro-

duces disparity in verdicts, dissatisfaction with the basis of decision, and a perception of discrimination. These disadvantages are reduced by the felony murder doctrine.

\* \* \* \* \* \*

* * * The rule has beneficial allocative consequences because it clearly defines the offense, simplifies the task of the judge and jury with respect to questions of law and fact, and thereby promotes efficient administration of justice.

Crump & Crump, *In Defense of the Felony Murder Doctrine*, 8 Harv.J.L. & Pub.Pol'y 359, 372, 375 (1985) (footnote omitted).

The authors then recognized from citation of *People v. Burton*, 6 Cal.3d 375, 388, 99 Cal.Rptr. 1, 9–10, 491 P.2d 793, 801–02 (1971), that availability of the felony murder charge eliminates the requirement for the *fine judicial calibration* involved in direct proof of intent.

ries is proved in its unanimous decision by finding proof beyond a reasonable doubt. Institutional due process is not provided if the prosecution elects an either/or basis and the theory is left among the jury's individual membership to select an either/or basis so that no unanimous decision is necessarily made.

The proper analysis and construction requirement has been carefully developed and expertly defined by the Colorado Supreme Court as most recently stated in *People v. O'Neill*, 803 P.2d 164, 173 (Colo. 1990):

> In [*People v.*] *Lowe*, [660 P.2d 1261 (Colo.1983)], we stated the rule of lenity required the first-degree murder statute be construed in favor of the defendant, and "that construction is that a defendant can be convicted only of one first-degree murder for one killing." *Id.* at 1269. We held that murder after deliberation and felony murder were alternative ways in which to commit first-degree murder, and the proper procedure was to inform the jury
>
> > "that the defendant is charged with one crime, first-degree murder. The jury's special verdict should indicate which theories of first-degree murder, if any, have been proved by the evidence.... If the jury is asked only for a general verdict, then on appeal there is no way to decide upon which theory the jury reached its verdict. In such a case an error relating to either count would void the entire verdict."
>
> *Id.* at 1271. [Colorado followed] *Lowe* in *People v. Bartowsheski*, 661 P.2d 235, 246 (Colo.1983), and more recently in *People v. Saathoff*, 790 P.2d 804, 807 (Colo.1990).

This case is dissimilar from *Natelli,* where an issue was made of the form of issues submission or *People v. Sampson*, 145 A.D.2d 910, 536 N.Y.S.2d 291 (1988), where defendant failed to preserve his contention because of a lack of request for submission in an appropriate fashion. *See likewise People v. Paxhia*, 140 A.D.2d 962, 529 N.Y.S.2d 638 (1988), where, although the New York court found error involving intentional murder and depraved mind murder, the defendant could not preserve his claim by timely objection and *State v. Duhan*, 194 Conn. 347, 481 A.2d 48 (1984). The joinder of felony murder and premeditated murder in a single count, when resolved by the jury in a general verdict without appropriate instructions for identifying criteria, leaves a completely unresolved question whether the jury was unanimous in making any decision. *United States v. Starks*, 515 F.2d 112 (3rd Cir. 1975). *Cf. United States v. Alsobrook*, 620 F.2d 139, 143 (6th Cir.), *cert. denied* 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980), where the form of the verdict or the method of instruction left no doubt as to the unanimity of jury decision and *United States v. Berardi*, 675 F.2d 894, 899 (7th Cir.1982).

It should be recognized that *Stromberg v. People of State of California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Williams v. State of North Carolina*, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942); and, to a degree, *Yates*, 354 U.S. at 312, 77 S.Ct. at 1073, do not reach or address the stage of evaluation presented here. Those cases provide factual situations and pleading status where none of the bases of an undifferentiated general verdict were declared to be invalid and consequently serve to invalidate the conviction itself when the determination could not be made of what actually was the basis for jury verdict. This case reaches a more advanced stage of consideration of the issue of a non-unanimous jury verdict where we find alternatives were presented and then apply fact finding in the appellate court which had not been provided in any definable jury decision. *See likewise Cramer v. United States*, 325 U.S. 1, 36, 65 S.Ct. 918, 935, 89 L.Ed. 1441 (1945). What the jury was not here requested to determine is embossed upon the decision by a *nisi prius* fact finding activity by the majority of this court.

The issue of compatible charges of premeditated and intended murder, where each is the subject of a guilty verdict and where the verdict is unreconcilable, is sim-

ilar, albeit not identical, to that of negligence or reckless conduct, *State v. Moore*, 458 N.W.2d 90 (Minn.1990), and intentional murder or reckless manslaughter, *People v. Gallagher*, 69 N.Y.2d 525, 516 N.Y.S.2d 174, 508 N.E.2d 909 (1987). The thesis is identical that the appellate court should not be called to invade the jury's function or, following jury failure, to make the critical determination by " 'exercise of interest of justice jurisdiction' " to weigh the facts. *Moore*, 458 N.W.2d at 94 (quoting *Gallagher*, 516 N.Y.S.2d at 176, 508 N.E.2d at 911). Furthermore, in this case, a waiver cannot be extracted nor a harmless error benefit applied. *State v. Olson*, 459 N.W.2d 711 (Minn.App.1990).

This case is also different than the dual convictions or the separate murder offenses committed within one murder where the issue of alternative convictions and dual sentences is created. *People v. Fields*, 199 Ill.App.3d 888, 145 Ill.Dec. 859, 557 N.E.2d 629 (1990). *See likewise Conway v. State*, 489 So.2d 641 (Ala.Cr.App. 1986), where that court found the trial court did not error in refusing to accept the jury's initial verdict which included clearly conflicting convictions, *e.g.* guilty of felony murder, not guilty of intentional murder and guilty of manslaughter, but guilty of kidnapping. Upon resubmission and after six minutes, the jury returned for a finding of guilty of kidnapping.

In acting like a supreme court, we should create productive and definable principles for our legal future and not stop short by only absolving past insufficiencies or mistakes. This jury was not properly directed to a unanimous jury verdict on either of the bases upon which their decision was required. Consequently, I dissent from the majority decision on this subject. The proper difference between the stature and responsibility of the supreme court and that of an intermediate appellate tribunal is an achieved responsibility for us to teach and build for the future, to move beyond the maintenance responsibility of the intermediate appellate tribunal, which is only to

correct or absolve for the past. Too often, in hurry or disinclination, we as the constitutionally created supreme court, ignore our responsibility for the future to do more than affirm or reverse in absolution or justification of harmless error in croaking, "nothing is perfect."

## IV. COURT DECISION TO REQUIRE APPELLANT TO TESTIFY IN ORDER TO PRESENT HIS DEFENSE

Appellant's defense to a first degree murder conviction was anchored on absence of intent to commit robbery to avoid felony murder and the lack of mental capacity to form the requisite specific intent to be guilty of premeditated murder. The first defense was shipwrecked by lack of a properly differentiated verdict form and the second defense went down when the trial court required appellant to testify as the price of establishing a foundation for the expert psychologist to testify. Then, after appellant had "spilled his guts" to authenticate his expert witness's appearance, the expert witness was stopped short from presenting his testimony on the basis that it would invade the province of the jury. This case personifies climactic developments during trial which denied appellant any real opportunity to defend or to even rationally approach presentation of a theory of his defense during the proceeding.

Procedurally, structurally and academically, this case is so bad that even the laws of chance or chaos should foreclose repetition. Hope then exists that perhaps the detrimental law here created will confine itself by obviousness to only this case. Consequently, the extended dissection of the obviousness of the adjudicatory misdirection may be avoided.[3]

There is no question that by trial court decision, the price for defense witness testimony was testimony by appellant himself. In result, appellant was required to prove his own guilt in order to have the opportu-

---

**3.** Obviousness as the test here leaves future consideration for the reader to supply precedential

authority to contradict or confirm.

nity to use his expert defense witness who would testify about character of factors which directly related to the charged guilt. I agree with neither the majority nor the special concurrence in judicial amendment for this decision to decimate the rights provided by both the federal and state constitutions against compelled self-incrimination. Wyo. Const. art. 1, § 11. "No person shall be compelled to testify against himself in any criminal case." *Id.* "[N]or shall he be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

Simply stated, by trial court action, appellant was foreclosed use of his defense witness unless he chose to testify. The results were anything but harmless. Clear, explicit and direct violations of the constitutional rights against self-incrimination were created. *No one* provides any authority that an effort to defend waives the right against self-incrimination. The error is not sugarcoated by the transference to waiver of the privilege by election to testify. Here, in order to have the assistance of a proposed witness, the trial court required that appellant first testify since, *as a rule for the case,* a defense of insanity had not been pleaded. The degree of the enormity of the mistake or the insufficiency of reasoning for justification defies my adequate characterization.

## V. REQUIREMENT OF TESTIMONY FOR ADMISSIBILITY FOUNDATION

This majority comes no closer to reason or precedent in justification of the trial court decision that appellant had to testify in order for a foundation to exist for Dr. Brian Miracle, a well-recognized psychologist, to be permitted to testify about the mental condition of appellant. Stripped of side-stepping and persiflage, justification of the trial court requirement cannot be authenticated by the record or defined in present decision. One of the strangest rules of current creation emerges—whether defined as harmless by majority or intentional waiver by a special concurrence. The trial court extracted the price of forced testimony defined as foundational evidence,

in order for the expert witness to even be allowed to take the stand to testify within a field and about a subject where he was unquestionably an expert and *had previously testified dozens of times in the Wyoming court system.*

## VI. REJECTION OF TESTIMONY OF THE EXPERT WITNESS AFTER APPELLANT TESTIFIED TO PROVIDE FOUNDATION

As a postscript, after appellant had satisfied the foundational basis for the injected requirement to testify to gain the right to present the expert witness, which in effect resulted in appellant's confession in open court, the trial court then dispositively rejected all of the psychologist's testimony on the basis that it invaded the province of the jury in calling for an opinion about the mental state or condition of appellant. In direct observation, the trial court was overtly wrong since an intent crime was at issue. What this majority now does not only serves to pervert long established rules for the use of expert witnesses, but also pollutes our law for future cases.

## VII. CONCLUSION

Appellant testified as a requirement of the trial court in order for an effort to be made to defend and then the proposed defense was denied as invading the province (or providence) of the jury. Appellant's constitutional rights against self-incrimination and to defend were trampled upon under the concept of a requirement to provide foundation. Inane attitudes about admissibility were then bruskly applied and ultimately an improper verdict form was used permitting a non-unanimous jury decision. In anticipation that we may accidentally, but almost deliberately, propagate the evil of this case in future law, I now strongly dissent.